## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

| | |
|---|---|
| JOHNATHAN BURKHARDT and DEVEN BURKHARDT, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | Case No.: 3:25-cv-693 |
| v. | CLASS ACTION |
| MONEYLION TECHNOLOGIES INC., ML PLUS, LLC, and MONEYLION OF FLORIDA, LLC, | JURY TRIAL DEMAND |
| Defendants. | |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiffs Staff Sergeant ("SSG") Johnathan Burkhardt and Deven Burkhardt (collectively, "Plaintiffs"), individually, and on behalf of all others similarly situated, and through their own knowledge and upon information and belief of their counsel, bring this Class Action Complaint against Defendants MoneyLion Technologies Inc. ("MLT") ML Plus, LLC ("MLP") and MoneyLion of Florida, LLC ("MLF") (collectively referred to as "Defendants") and allege:

## INTRODUCTION

1.     This class action challenges a brazen and calculated scheme by Defendants MLT, MLP, and their lending subsidiaries, like MLF, to systematically exploit highly vulnerable borrowers through unlawful, deceptive, and coercive practices designed to extract exorbitant finance charges under the false pretense of offering legitimate loans. For close to a decade, Defendants have used this scheme to disguise illegal interest charges as "Turbo Fees," "Tips," and "Monthly Membership Fees," and trap borrowers into a deliberately rigged ecosystem, where access to basic credit is conditioned on payment of astronomical charges that borrowers are required, misled, or coerced to pay.

2.     This scheme violates the Military Lending Act ("MLA"), 10 U.S.C. §§ 987, *et seq*. Congress designed the MLA to protect active duty servicemembers of the United States Armed Forces ("covered members") and their spouses ("dependents") (altogether "covered borrowers").[1] And Congress enacted the MLA because an epidemic of predatory lending was threatening and endangering military readiness, security clearances, and servicemember morale and retention.

---

[1] 32 C.F.R. 232.3(g).

3.      Defendants offer borrowers two products: Instacash loans—advertised as providing instant access to cash for free; and Credit Builder loans—advertised as improving a borrower's credit health.

4.      Both descriptions of Defendants' financial products are false, and are nothing more than a façade to hide an illegal lending operation. Defendants' Instacash loans are not free, have annual percentage rates ("APRs") of 495%, 990%, 2,310% or greater, and primarily serve to trap consumers in endless debt cycles, while Defendants' Credit Builder loans do not help consumers, actually hurt their credit health, and primarily serve to force consumers to pay additional costly charges.

5.      Borrowers caught in the debt trap created by Instacash loans, like Plaintiffs and the Class, find it nearly impossible to escape. The debt cycles created by these unlawful loan terms allow Defendants to take Plaintiffs and the Class members' bank account as security for the obligation, even where the loans exceed 36% Military APR ("MAPR"), to extract costly charges, which deplete paychecks and require borrowers to take out more loans to repay old loans. It is next to impossible to avoid repaying Instacash loans, as Defendants require consumers to link their bank accounts to Defendants' proprietary software application and

authorize Defendants to automatically debit those linked bank accounts immediately after a paycheck is deposited on payday in the consumers' account.

6.    Defendants' Credit Builder loans only compound this issue. Credit Builder loans saddle consumers with additional costly charges and harm rather than help their credit. Consumers cannot avoid paying these loans either: Defendants charge monthly fees until Credit Builder loans are repaid and refuse to honor cancellation requests.

7.    Defendants' treatment of servicemembers and their spouses is particularly egregious. Despite federal law prohibiting lenders from charging more than a 36% MAPR, Defendants knowingly extend loans to covered borrowers at interest rates far above this limit by tacking on so-called "Turbo Fees," "Tips," and "Monthly Membership Fees." And Defendants hide the cost of the actual charges by failing to correctly label them as "finance charges," and by failing to disclose their cost in terms of an APR, as the Truth in Lending Act ("TILA") requires. On top of that, Defendants guarantee borrowers pay these disguised, illegal charges by requiring Plaintiffs and the Class members to provide their bank

accounts as security for Instacash loans that exceed 36% MAPR, and continuing to charge fees until Credit Builder loans are repaid.

8.     The Instacash and Credit Builder loans that Defendants extended to Plaintiffs and the Class violate the MLA, which renders those loans *void ab initio*. Defendants' Instacash and Credit Builder loan agreements ("Agreements") contain two provisions prohibited by the MLA: (1)  the Instacash and Credit Builder loans exceed the MLA's statutory rate cap of 36% MAPR; and (2) the Instacash loan agreements require consumers to provide their bank account as security for the obligation where the loan exceeds 36% MAPR. Exhibits A–B. See 10 U.S.C. § 987(a)(3)).

9.     Plaintiffs seek justice for the thousands of covered members and dependents systematically swindled, financially immobilized, and trapped by Defendants' predatory lending racket. Defendants violated the MLA, TILA, and state consumer protection laws by operating an illegal, fee-based credit scheme. This lawsuit seeks a declaration from the court that Defendants loans extended to Plaintiffs and the Class are void, halt the ongoing collection of unlawful debts, recover ill-gotten gains, and obtain statutory damages for every covered borrower ensnared in this

exploitative web. What Defendants marketed as financial empowerment was in truth a calculated strategy to strip vulnerable individuals—especially covered members and their dependents—of their rights, their money, and their dignity.

10.    Since Defendants' loans violate the MLA, the agreements and loans between Defendants and Plaintiffs (and the Class members) are void from inception under 10 U.S.C. § 987(f)(3).

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this matter pursuant to 10 U.S.C. § 987(f)(5)(E) and 28 U.S.C. § 1331.

12.    The Court also has jurisdiction under 28 U.S.C. § 1332(d), the Class Action Fairness Act, because this is a proposed class action, on behalf of a Class of over 100 Class members, whose claims aggregate in an amount in controversy that exceeds five million dollars, and which includes members whose state citizenship is diverse from that of Defendants.

13.    Plaintiffs' payments ultimately flowed to MLT.

14.    This Court possesses personal jurisdiction over Defendants because they deliberately and regularly conducted business, including

marketing, distributing, promoting and/or extending consumer credit, in and into Florida. The loans at issue are believed to be issued from within this District, and the monetary funds that are the subject of the loan agreements are disbursed from financial institutions located in the State of Florida. Plaintiffs' interest payments were retained by Defendants using revolving credit lines, assets, or agreements that they entered to fund Plaintiffs' loans. Plaintiffs received some or all of their loans while located in the State of Florida. MLF is registered to do business in the State of Florida and maintains a registered agent in the State of Florida. Defendants are each subject to general jurisdiction, have engaged in much of the actions complained of herein in Florida and profited handsomely from their business in the State of Florida at all times relevant to this Complaint.

15.    Venue is proper in this district pursuant to 10 U.S.C.A. § 987(f)(5)(E) and 28 U.S. § 1391, because MLF resides in this District, Plaintiffs purchased their loans in the State of Florida, Defendants extended Plaintiffs' loans within the State of Florida, Plaintiffs were solicited by the Defendants to purchase Defendants' loans in the State of Florida, Plaintiffs have used their loan proceeds in the State of Florida,

and a substantial part of the events and omissions giving rise to the MLA claims at issue occurred in this District.

16.    Plaintiffs have Article III standing because they suffered a concrete injury in that: (1) they are required to "pay interest" and paid interest on loans which contain terms that are prohibited by the MLA in violation of § 987(a); (2) they are obligated to pay money under Defendants' loans that were void from inception because they contain terms prohibited by § 987(e); (3) Defendants are imposing interest due on Plaintiffs' loans which constitutes a requirement to pay interest in violation of § 987(a); and (4) Plaintiffs require declaratory and injunctive relief voiding the loans at issue, and precluding enforcement of the Defendants' MLA-violative interest rates and removing their bank accounts as security for the obligation of these illegal loans.

17.    At all times material hereto, MLT maintained and orchestrated MLP and MLF's business dealings within the State of Florida.

## PARTIES

**PLAINTIFFS**

18.    Plaintiff Staff Sergeant ("SSG") Johnathan Burkhardt is a natural person and citizen of Florida, residing in Okaloosa County, Florida, and serving on active duty in the 7th Group Special Forces in the United States Armed Forces.

19.    Plaintiff Deven Burkhardt is a natural person and citizen of Florida, residing in Okaloosa County, Florida.

20.    At all times relevant hereto, SSG Johnathan Burkhardt was married to and the spouse of Plaintiff Deven Burkhardt.

21.    At all times material hereto, SSG Burkhardt has been a "covered member" as defined by the MLA, 10 U.S.C. § 987(i)(1)(A), because he was on active duty in the United States Armed Forces.

22.    SSG Burkhardt has served eleven (11) years in the United States Army and currently maintains a security clearance.

23.    At all times material hereto, Deven Burkhardt was a "dependent" of a "covered member" as defined by the MLA, 10 U.S.C. § 987(i)(2) as the spouse of SSG Burkhardt.

**DEFENDANTS**

24.    Defendants are each "creditors" that extended "consumer credit" to Plaintiffs as those terms are defined in 10 U.S.C. § 987(i)(6) and 32 C.F.R. § 232.3(h) & (i).

25.    Defendant MoneyLion Technologies Inc. f/k/a MoneyLion Inc. ("MLT") is a Delaware Corporation headquartered in New York. Through its digital-technology platform, including its website and mobile app, MLT has offered and brokered online single payment balloon loans and installment loans, engaged in servicing and collections of such loans, and provided other financial products and services to consumers as described in more detail below. MLT is the direct corporate parent of the MoneyLion lending subsidiaries MLF and MLP. MLT has managed, directed, controlled, and staffed the MLF lending, servicing, and collections operations. MLT has similarly managed, directed, controlled, and staffed MLP's membership-program operations and its servicing and collections of membership fees, and MLT has provided all transactional and payment services for those operations. MLT is a "creditor" of the Plaintiffs' and the Class members' loans.

26.    Defendant MLP is a Delaware limited liability company headquartered in New York. MLP has offered and provided membership programs to consumers in connection with the online installment consumer loans offered by MLT and its MoneyLion lending subsidiary, MLF. MLP has serviced and collected fees associated with those membership programs. MLP has no employees of its own, relying entirely on MLT for its staffing and management. MLP has one member: (1) Diwakar Choubey located at 249 West 17th Street 4th Floor New York, New York, 10011. MLP is a "creditor" of Plaintiffs' and Class members' loans.

27.    MLF is a Delaware Limited Liability Company with its principal place of business in New York and is a "creditor" of Plaintiffs' loan Agreements. MLF maintains a registered agent located at 1200 South Pine Island Road, Plantation, Florida 33324. MLF has two members: (1) MoneyLion Technologies Inc., located at 249 West 17th Street, 4th Floor New York, New York 10011; and (2) Adam VanWagner located at 249 West 17th Street 4th Floor New York, New York, 10011. MLF is a "creditor" of Plaintiffs' and Class members' loans.

28.    Defendants are each "creditors" under the MLA because, during the Class Period, each of those Defendants has – by itself and with its affiliates – engaged in the business of extending consumer credit, and each Defendant meets the transaction standard for a "creditor" under Regulation Z, 12 C.F.R. Part 1026, with respect to extensions of consumer credit to borrowers covered by the MLA. 32 C.F.R. § 232.3(i)(3). MLT, along with MLP and MLF are "affiliates" under 32 C.F.R. § 232.3(a). MLT "controls" MLP and MLF and MLP and MLF are each controlled by MLT.

29.    Although separate entities, Defendants engage in uniform and common operations related to the ownership and operation of balloon loans and installment loans and related extensions of consumer credit, and the marketing and sale of such loans.

30.    Defendants share many of the same officers and directors, registered agents, and office addresses, including the same President/CEO, secretary, vice president, and treasurer.

31. Moreover, during the Class Period,[2] MLT has controlled all of its MLT lending subsidiaries, including MLF, and each of the MLT lending subsidiaries has been controlled by MLT.

32. Accordingly, MLT and all of its lending subsidiaries are "affiliates."

33. During the Class Period, MLT has provided material services to each of its lending subsidiaries in connection with their origination, extension, servicing, and collection of consumer loans, including providing the capital to the MLT lending subsidiaries for their loan originations; managing and staffing their operations; designing, operating, marketing, maintaining, and administering the loans and loan-related programs offered to consumers; setting underwriting guidelines; implementing compliance policies; providing technological platforms through which the loans are marketed, offered, and serviced and through which consumers make payments; establishing and processing payments and other transactions relating to the extension and servicing of such loans; establishing accounts used to secure loans and

---

[2] The Class Period is five (5) years prior to the day the initial Class Action Complaint is filed through the date notice is disseminated.

accepting and processing transactions relating to such accounts; and servicing and collecting the loans, including by notifying and contacting consumers by telephonic and electronic means and liquidating and offsetting their accounts.

34.    MLP is controlled by MLT, and MLP is under common control with the MLT lending subsidiaries, including MLF. Accordingly, MLP is an affiliate of MLT and the MLT lending subsidiaries, including MLF. MLP has provided material services to MLT and the MLT lending subsidiaries including administering membership programs required in connection with consumer loans; and charging, servicing, and collecting membership fees required under such loans, including by notifying and contacting consumers and withdrawing funds from their accounts.

## **THE MILITARY LENDING ACT, 10 U.S.C. §§ 987, *et seq.***

35.    The United States Congress passed the MLA in 2006. It was enacted to protect covered borrowers from unfair or abusive loans to covered members and their dependents, who in the years prior had been disproportionate victims of predatory lending.

36.    The MLA directs the Department of Defense ("DoD") to prescribe regulations to carry out the statute.

37.    32 C.F.R. Part 232 implements the MLA and contains limitations on and requirements for certain types of consumer credit extended to covered borrowers.

38.    Under MLA regulations passed by the DoD, "consumer credit" is defined as: "Credit offered or extended to a covered borrower primarily for personal, family, or household purposes, and that is: (i) Subject to a finance charge; or (ii) Payable by a written agreement in more than four installments." 32 CFR § 232.3(f)(1).

39.    Defendants' Instacash and Credit Builder loans constitute extensions of "consumer credit," as defined under the MLA and 32 CFR § 232.3, because: (1) Plaintiffs and the other Class members were "covered members" and/or "dependents"; (2) Plaintiffs' loans were primarily for personal, family, or household purposes; and (3) Plaintiffs' Instacash and Credit Builder loans were subject to either a finance charge and/or were payable in more than four installments.

40.    The MLA places a duty on "creditors" to determine whether a potential borrower is a "covered borrower."

41.    Creditors can use the free MLA Database maintained by the DoD to make this determination.

42.    There is nothing in the MLA requiring Plaintiffs to identify themselves as "covered borrowers."

43.    Defendants made no attempt to determine if Plaintiffs were covered borrowers under the MLA.

44.    Defendants routinely and systematically ignore their obligations under the MLA to determine whether an individual is a covered borrower or to comply with the MLA.

45.    Upon information and belief, Defendants use standard form agreements for all loans extended during the Class Period, including those extended to covered borrowers.

46.    Defendants routinely violate the MLA in several distinct ways: (1) exceeding the statutory rate cap of 36% MAPR in violation of 10 U.S.C. § 987(b); and (2) by requiring borrowers to provide their bank account as security for the obligation where the Defendants' Instacash loans exceed 36% MAPR in violation of 10 U.S.C. § 987(e)(5) and 32 C.F.R. 232.8(e).

47.    Because of these separate MLA violations, Plaintiffs' and the putative Class members' loans are void from inception.

48.    Defendants' violations ensured that Plaintiffs unknowingly paid interest on a void contract, incurred financial obligations they could not legally be required to repay, and suffered concrete harms including diminished credit scores and a risk to SSG Burkhardt's security clearance. For military servicemembers like Plaintiffs, the presence of such derogatory marks on their credit reports poses a direct and significant threat to their employment status, including the loss of security clearances and the risk of involuntary separation from service. The harm caused by these omissions is precisely the type of injury the MLA was enacted to prevent.

## FACTUAL ALLEGATIONS

## I.    DEFENDANTS' INSTACASH LOANS

### A.    Defendants Advertise Their Instacash Loans as Providing Instant Access to Cash

49.    Defendants offer consumers a loan product called "MoneyLion Instacash."

50.    This product is advertised as providing instant access to cash to cover "[u]nexpected vet bills, . . . last minute date night[s]," or other unexpected or time-sensitive obligations.



# MoneyLion Instacash®

Unexpected vet bills, or last minute date night—no worries! If life throws you a curveball, get Instacash cash advances up to $500.

51.    Over the years, this product has allowed consumers to obtain between $500.00 to $1000.00 in loans per pay period, but consumers are limited to taking out $100.00 at a time. As explained below, by limiting borrowers to taking out $100.00 at a time, Defendants ensure borrowers pay more fees to obtain Instacash loans. Ultimately, Defendants $100.00 limit increases charges, requiring consumers to take out five loans or ten loans with five to ten times the fees to get the same advertised $500.00 to $1000.00 loan.

52.    Defendants' Instacash loan product works as follows:

## How does it work? Simple.

1    Sign up for MoneyLion or download the MoneyLion app to sign up for Instacash.
     If you already have the app, tap Instacash on the 'Accounts' tab.

2    Link the bank account where you receive your paycheck to see if you qualify.

3    Select the amount you want.

4    Confirm, and voila! You're done. Enjoy your cash.

**B.    Defendants Charge Fees to Obtain Compensation for Offering Instacash Loans**

53.    To ensure they obtain compensation for offering Instacash loans, Defendants charge a so-called "Turbo Fee" between $0.49 to $8.99 to obtain Instacash loans for their advertised and intended purpose—as an instant source of money. The amount of the fee increases as the size of the loan increases — just like traditional interest.[3]

54.    Consumers who do not pay this fee obtain an inferior version of Defendants' Instacash loans that is not instant at all.

55.    That version of Defendants' product is deposited up to five business days after a loan request is made and cannot be used to obtain "instant" Instacash loans or pay unexpected expenses or time-sensitive obligations. The market for these loans is people who do not want to wait until payday.

56.    In addition to requiring payment of the "Turbo Fee" to obtain the advertised version of the Instacash loan, Defendants automatically

---

[3] Fees are lower if the funds are sent to a so-called "Roar Money" account established through Defendants, though the fees still increase with the size of the loan.

include that charge and lead consumers to believe that they cannot avoid

paying the "Turbo Fee."

57. When consumers obtain an Instacash loan from Defendants,

they are shown one of the following two screens:

 

58. Neither screen states that the "Turbo Fee" is optional.

59. And the newer screen (on the right) does not even display that

charge; instead, the newer screen hides that charge in a "Total amount"

dropdown box.

60. If a consumer fails to click that box to see the hidden fee, they

will not even know they are being charge a "Turbo Fee."

61.    And even for a consumer who understands the "Turbo Fee" is avoidable, they are only able to avoid that fee if they obtain an inferior version of the Instacash loan that Defendants advertise—a version that does not provide immediate access to cash.

62.    And even for consumers who choose to obtain this inferior and different credit product, Defendants place roadblocks for the consumer to bypass and avoid paying the "Turbo Fee."

63.    A consumer who seeks to avoid the fee must first figure out how to do so. Even after eliminating that charge, they are presented with additional friction through a screen that pushes them to get the cash immediately:



64.    This screen displays a large, bright, blue/green "Get cash now" button. If a consumer clicks that button, they are charged the fee. If they click the "select another method" button, they can avoid the fee, but they cannot obtain the advertised version of the Instacash loan; instead, they obtain a different and inferior version of the Instacash loan product, one that does not provide instant access to money and cannot be used to cover surprise expenses.

65.    The purpose of the "Turbo Fee" is to obtain compensation for lending money; the charge does not cover the actual cost of any service or

serve any other purpose, as it costs little to nothing to advance money to consumers immediately, rather than days later.

66.    Because consumers are limited to obtaining $100.00 in loans at a time, even if they qualify to obtain up to $500.00 or $1000.00 for a pay period, consumers end up paying multiple "Turbo Fees" each pay period and even in a given day.

67.    In addition to the "Turbo Fee," Defendants ask consumers to pay a "Tip" for each Instacash loan Defendants issue.

68.    The so-called "Tip" charge, like the "Turbo Fee," is solely intended to provide compensation to Defendants for lending money.

69.    Calling this charge a "Tip" is deceptive because the charge does not go to a delivery driver, a server, or an employee trying to make ends meet; instead, this charge is solely intended to provide an additional revenue stream for Defendants. Yet Defendants shows pictures of individuals asking for the tips, implicitly planting the idea that the money supports human beings and reinforcing the commonly understood meaning of "Tip."

70.    Similar to the "Turbo Fee," Defendants structured their MoneyLion app to ensure that a sufficient number of users are guilted or

coerced into paying the "Tip" charge so Defendants ensure that they obtain a profit from lending money.

71.    Like the "Turbo Fee," the "Tip" charge is preselected for users to pay, as the screens presented in ¶ 57, *supra*, show. The amount that is preselected is based on a percentage of the amount that is advanced to a consumer.

72.    To avoid this charge, consumers must manually change the preselected amount to zero using a drop-down box. If they fail to do so, or fail to understand that they are able to do so, consumers are charged the preselected amount.

73.    Defendants pre-select a "Tip" charge with the intent to anchor consumers to the initial amount they see.

74.    To ensure that this "Tip anchor" works, Defendants use a host of deceptive and coercive tactics to get consumers to pay tips.

75.    For example, consumers that navigate the MoneyLion app that refuse to "Tip" are asked to rethink their decision:

 

76.   Further, if the consumer did not include a "Tip" for the prior loan, they are solicited to add the "Tip" before they get a new loan:



77.    Thus, Defendants make clear that the "Tip" is expected and implicitly threaten users with restrictions on future use if they do not "Tip." Defendants erected these various roadblocks that consumers must navigate with the express purpose of ensuring that a sufficient number of consumers pay Defendants' "Tip" charge so Defendants can obtain compensation for lending money.

78.    In addition to these tactics, Defendants make explicit claims to consumers that the payment of "Tips" is necessary for Defendants to continue offering Instacash loans, which leads consumers to believe that they must pay "Tips" to ensure continued access.

79.    For example:

- Defendants represent that "tips are what help us cover the high costs of administering Instacash at 0% APR for the large and growing MoneyLion community."

- Defendants claim that "it takes money to keep 0% APR Instacash running, so please consider a tip to help keep it free," indicating to consumers that the service will not be "free" if one does not "Tip."

- Defendants suggest that a consumer's "participation" in the payment of the "Tip" charge "will help us ensure that we can keep offering the [Instacash] product."

- Defendants represent that the "Tip" charge "help[s] us cover the high cost of keeping Instacash interest-free and readily available to as many members as possible. We're all in this together."

80.    Defendants continually evaluate their messaging and screens to ensure that their tactics are effective in requiring consumers to pay Defendants' "Tip" charges and "Turbo Fees."

81.    These tactics have worked, as virtually all borrowers pay the "Turbo Fees," and a large percentage of borrowers pay the "Tip" charge.

82.    Despite Defendants' claims that their Instacash loans are "0% APR" and "no interest," these charges are very costly.

83.    For example, a $100.00 Instacash loan with a preselected "Turbo Fee" of $8.99, a preselected "Tip" of $10.00, and a fourteen-day repayment schedule has an APR above 495%. The exact same loan with a seven-day repayment schedule has an APR above 990%. And the same loan with a three-day repayment schedule has an APR above 2,310%.

84.    Because the overwhelming majority of borrowers pay a "Turbo Fee," a "Tip," or both charges to obtain Instacash loans, the average APR for Defendants' Instacash loans is in the triple digits, which far exceeds the MLA's 36% rate cap. *See* Exhibit A, p. 10 (finding APRs for similar cash advance apps average 367%); Exhibit B, p. 7 (finding APRs for similar cash advance apps average 334%).

## C.    Defendants Structure Their Loans to Ensure They Obtain Repayment and Minimize their Risk.

85.    Like every lender, Defendants expect to obtain repayment of their loans and the fees they charge.

86.    To ensure repayment occurs, Defendants require Plaintiffs and the Class to provide their bank account as security for the Instacash loan obligation by way of borrowers linking their bank accounts and payment cards to Defendants' MoneyLion app and authorizing Defendants to automatically debit the linked accounts and cards on the borrowers' next scheduled payday in an amount that equals the principal of the borrower's Instacash loan and the "Turbo Fee" and "Tip" the consumer was charged.

87.    For example, if a consumer obtains a $100.00 Instacash loan and is charged a $8.99 "Turbo Fee" and $10.00 "Tip," they must, as a condition of receiving the loan, authorize Defendants to automatically debit their linked bank accounts and payment cards in the amount of $118.99 on their next scheduled payday.

88.    Defendants enforce these automatic debit rights on every loan they issue to obtain repayment and will continue to debit consumers' linked accounts or cards until they obtain repayment of a loan and all fees charged.

89.    To ensure that linked bank accounts and payment cards will have sufficient money to satisfy their automatic debits, Defendants have

created a proprietary credit check that borrowers must pass before a loan is issued.

90.    The purpose of this credit check, like any other credit check, is to guard against non-payment.

91.    This credit check requires borrowers to have an employer that pays them regularly (or some other source of recurring income that will appear in the deposit history of their linked bank account) and requires the deposits from their employer (or other source of recurring income) be high enough to satisfy Defendants' automatic debits.

92.    Defendants also analyze spending history and other information to decide what cumulative amount of Instacash loans and fees Defendants will be able to debit on payday.

93.    If Defendants believe they will be unable to obtain repayment of an Instacash loan and related charges, they will not issue a loan at all, or they will limit the size of the loan issued.

94.    After determining that they will be able to obtain repayment of an Instacash loan and related charges, Defendants time their account debits to occur immediately after a borrower's paycheck is deposited into their bank account on payday.

95.    In other words, Defendants are first in line to receive payment from the borrower's paycheck.

96.    The underwriting and collection procedures that Defendants employ are extremely effective at ensuring that Instacash loans, "Turbo Fees," and "Tips" are repaid.

97.    Indeed, Defendants have a near-100% collection rate on non-fraud related Instacash loans. That repayment rate is far higher than a traditional brick and mortar lender.

## D.    Defendants' Instacash Loans Include Charges That are Prohibited by the MLA

98.    Payday lending refers to a short-term, high-cost form of lending, requiring borrowers to repay small dollar loans on their next payday.

99.    This form of lending often traps consumers in reborrowing cycles because the high fees charged on payday loans eat into paychecks, which reduces the amount borrowers receive on payday, requiring them to take out new loans to fill the gap created by old loans.

100.    Trapping consumers in reborrowing cycles is highly profitable for payday lenders (because it enables them to continually harvest payments for expensive charges from a borrower's paycheck), but it does

not help improve a person's financial health (because their paycheck is repeatedly diminished by expensive charges, which makes it difficult for them to save money or pay for necessities).

101.  This cycle of reborrowing is well documented for cash advance apps like Defendants' MoneyLion app, as various studies show that the typical cash advance app user takes out at least one loan each pay period and continues to borrow even after the first or subsequent loans are repaid. *See* Exhibit A, pp. 7-9; Exhibit C, p. 7-8.

102.  Recognizing that high-cost loan products create reborrowing cycles that are detrimental to a person's financial health, Congress enacted the MLA to protect servicemembers and ensure that they would not fall victim to payday lending schemes.

103.  The MLA does so by prohibiting payday lenders from imposing an MAPR of "interest" above 36%. 10 U.S.C. § 987(b).

104.  "Interest" includes "all cost elements associated with the extension of credit, including fees, service charges, . . . and any other charge or premium with respect to the extension of consumer credit." *Id.* § (i)(3).

105. Defendants' "Turbo Fees" and "Tips" clearly are a cost element associated with the extension of the Instacash loans, as both the "Turbo Fees" and "Tips" are incorporated into a borrower's repayment obligation, increasing the amount of the automatic bank account debit that Defendants receive as a condition of issuing Instacash loans to borrowers.

106. Indeed, a borrower who receives a $100.00 Instacash loan and does not change the preselected default "Turbo Fee" of $8.99 to $0.00, and does not change the preselected default "Tip" of $10.00 to $0.00, will have $118.99 deducted from their linked bank account on payday.

107. Since Defendants' charges increase the cost charged to borrowers' accounts for Defendants' Instacash loans, those charges are "interest" under the MLA.

108. And because those charges routinely exceed the 36% rate allowed by the MLA and, on average, are equivalent to loans with APRs of 495%, 990%, 2,310% or more, those extensions of consumer credit violate the MLA.

**E.    Defendants' Instacash Loans Do Not Include the Disclosures Mandated By the Truth In Lending Act**

109.   Congress passed the Truth In Lending Act ("TILA") to ensure "a meaningful disclosure of credit terms" and to avoid "the uninformed use of credit." 15 U.S.C. § 1601(a).

110.   To that end, TILA requires lenders to disclose the cost of credit beforehand, including the disclosure of the cost of credit as a "finance charge," and as an "annual percentage rate" or "APR," depending on the amount of the advance and its cost. *Id.* § 1638.

111.   A "finance charge" includes the "sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit." *Id.* § 1605(a).

112.   Defendants' "Turbo Fees" and "Tips" are "finance charges" as they are payable to the person that is extended credit—Plaintiffs and the Class members—and they are imposed by Defendants as an incident to the extension of credit.

113.   Indeed, there is a close connection between Defendants' "Turbo Fees" and "Tips" and Defendants' Instacash loans—and those charges are, therefore, "imposed . . . as an incident to the extension of credit"—because

it is a borrower's effort to obtain an Instacash loan that triggers solicitation and payment of a "Turbo Fee" or "Tip."

114.   These charges would not be paid absent the extension of credit, which means they are inextricably intertwined with Defendants' extension of credit to Plaintiffs.

115.   Even though Defendants' "Turbo Fees" and "Tips" qualify as "finance charges," Defendants do not correctly label the charges as such, or disclose the cost of the charges as an APR, as TILA requires.

## II.    DEFENDANTS' CREDIT BUILDER LOANS

116.   In addition to offering "Instacash" loans to consumers, Defendants offer "Credit Builder" loans to consumers.

117.   Unlike the "Instacash" loans, which are balloon loans repaid in a single installment on payday, the "Credit Builder" loans are multiple payment installment loans paid over a period of months.

118.   Consumers cannot access a Credit Builder loan unless they enroll in "membership programs" offered and administered by Defendants and pay "Monthly Membership Fees."

119.   Initially, Defendants' Credit Builder loan was offered as a 12-month installment loan of $500.00 with a 5.99% APR. For consumers to

access the loan, Defendants required consumers to enroll in the "ML Plus Membership Program" and pay a $29.00 "Monthly Membership Fee." Only consumers who paid this fee and were current on their monthly fee payments could take out the Credit Builder loan.

120.   Currently, Defendants' Credit Builder loan is offered as a 12-month installment loan between $500.00 and $1,000.00 at APRs between 5.99% and 29.99%. To access the loan, consumers must join the "Credit Builder Plus Membership Program" and must pay "Monthly Membership Fees" of $19.99. Consumers are charged the $19.99 fee each month until they pay their loan in full and pay all monthly charges.

121.   For the current Credit Builder loan, Defendants disburse only a portion of the loan amount at origination and deposit the remainder into a "credit reserve account," which Defendants release to consumers once consumers have paid off the loan and paid all monthly fees charged for each month the loan was active.

122.   If consumers fail to pay a Credit Builder loan or monthly fees, Defendants try to collect the unpaid balance and the unpaid membership fees.

123.   Consumers with unpaid loan balances or monthly fees cannot cancel their Credit Builder Plus Membership Programs—despite claims in some loan agreements that they can do so.

124.   Similar to the Instacash loans, the Credit Builder loans do not accurately disclose the information TILA requires.

125.   Indeed, although Defendants' Credit Builder loans purport to have APRs between 5.99% and 29.99%, those representations are untrue, as these APR calculations fail to factor in the "Monthly Membership Fee" that borrowers must pay to access the Credit Builder loan and must pay until the loan is paid in full.

126.   When the monthly fee is included in the APR calculation, the actual APR is much higher than the APR Defendants disclose. For example, a $1,000.00 Credit Builder loan with a $169.79 finance charge and a 12-month repayment schedule has an APR of 29.99% without a monthly fee. But once the $19.99 monthly fee for twelve months is included, the actual APR for that loan exceeds 68%.

127.   Defendants never factor in the "Monthly Membership Fees" into their APR calculation, which means Defendants never accurately disclose the APR of their Credit Builder loans, in violation of TILA.

128.  Further, and similar to the "Turbo Fee" and "Tips" charged on Instacash loans, the "Monthly Membership Fees" charged on Credit Builder loans violate the MLA.

129.  As explained above, the monthly fees and finance charges that are charged on the Credit Builder loans yield APRs above the MLA's 36% rate cap.

130.  And the monthly fees qualify as "interest" under the MLA, as they increase the cost of the Credit Builder loans, just like the "Turbo Fees" and "Tips" increase the cost of Instacash loans.

## LOANS TO MLA COVERED BORROWERS

131.  In connection with extensions of consumer credit, the MLA and its implementing regulations contain protections for active-duty servicemembers and their dependents ("covered borrowers"). 10 U.S.C. §§ 987(i)(1), (2); 32 C.F.R. § 232.3(g). Those protections include: (1) a maximum allowable amount of all charges that may be associated with an extension of credit, 10 U.S.C. § 987(b); and (2) prohibitions against requiring borrowers to provide their bank accounts as security for the obligation of loans that exceed the statutory rate cap of 36% MAPR, like the Instacash loans. 10 U.S.C. § 987(e)(5) and 32 C.F.R. 232.8(e).

132.  Any credit agreement, promissory note, or other contract with a covered borrower that fails to comply with any provision of the MLA or contains one or more prohibited contract provisions is void from the inception of the contract. 10 U.S.C. § 987(f)(3); 32 C.F.R. § 232.9(c). DoD regulations required newly covered creditors, such as online installment lenders, to bring their operations into compliance with the MLA by October 3, 2016. *See* 32 C.F.R. § 232.12(a).

133.  Since about the fall of 2017, Defendants have extended closed-end credit—Instacash and Credit Builder loans—to covered borrowers. All of these loans constituted "consumer credit" under the MLA because they were offered or extended to covered borrowers primarily for personal, family, or household purposes and were subject to a finance charge. *See* 32 C.F.R. § 232.3(f)(1)(i).

134.  Defendants required, coerced, or misled covered borrowers to pay "Turbo Fees," "Tips," and/or "Monthly Membership Fees" before providing access to these extensions of credit.

## PLAINTIFFS' LOANS

**INSTACASH LOANS**

135. During the Class Period, Defendants extended Instacash loans to Plaintiff SSG Johnathan Burkhardt (active-duty military with the United States Army), and his spouse, Plaintiff Deven Burkhardt. Approximately every other week since 2022, Defendants extended Plaintiffs loans in amounts of up to $100.00 for each loan, and in cumulative amounts of up to $1,000.00 or more, resulting in Defendants extending dozens of loans to Plaintiffs each month.

136. Even if Plaintiffs qualified to receive an aggregate amount of loans above $100.00, Defendants prohibited Plaintiffs from accessing more than $100.00 per transaction. For example, if Plaintiffs qualified to receive $1,000.00 in a pay period from Defendants, Plaintiffs were only permitted to withdraw $100.00 at a time, essentially requiring them to take out 10 different loans to borrow $1,000.00.

137. For every $100.00 loan, Defendants required Plaintiffs to pay a "Turbo Fee" of roughly $8.99.

138. In addition to charging that fee, Defendants coerced a "Tip" and pressured Plaintiffs to pay that charge for each loan that Plaintiffs

received. Defendants preselected a "Tip" equivalent to a percentage of every loan Plaintiffs requested. Plaintiffs paid tips on many of their loan transactions.

139.  This structure has caused Plaintiffs to pay APRs well above the MLA's 36% rate. For example, Plaintiffs obtained a $100.00 loan, paid a $8.99 "Turbo Fee" and a $10.00 "Tip," and repaid the loan, fee, and tip in two weeks or less. That is equivalent to paying a loan with an APR of 495% or more. And because Defendants only allow Plaintiffs to obtain $100.00 at a time, Plaintiffs took out ten or more loans each pay period, all with APRs of 495% or greater.

140.  Additionally, Defendants required Plaintiffs to provide their bank accounts as security for the obligation in Defendants' "Instacash" loans and the Instacash loans exceed a 36% MAPR. Simply put, Defendants control Plaintiffs' bank account and control their ability to use their personal bank account freely, so, Defendants get paid before Plaintiffs ever pay their mortgage, groceries, and utilities. This level of control, coupled with the Defendants' usurious interest rates, have resulted in Plaintiffs being trapped in a reborrowing cycle, where they

must take out new loans to fill the gaps that have been created by prior loans.

141. Defendants extended hundreds of Instacash loans to Plaintiffs during the Class Period.

**CREDIT BUILDER LOANS**

142. In or around 2022, Defendants extended Plaintiffs their first Credit Builder loan. The loan was in the amount of $1,000.00, and Plaintiffs repaid it after 10 months. The loan ultimately caused Plaintiffs' credit to decrease because of the age of the debt.

143. In or around 2025, Defendants extended Plaintiffs a second Credit Builder loan. The loan was in the amount of $1,000.00 and included a "Finance Charge" of $155.54. Defendants represented that the APR for this loan was 29.69%, but the APR was much higher and far exceeded the MLA's 36% limit because Plaintiffs were required to pay a monthly fee of $19.99 to access this loan. Plaintiffs were required to pay this charge for every month the loan was unpaid. Indeed, the actual APR for the Credit Builder loan Plaintiffs received is above 36% MAPR.

144.  At the time of the filing of this Complaint, the Plaintiffs still owe hundreds of dollars on the Credit Builder loan with interest above the annual interest rate in excess of 36% MAPR.

145.  Plaintiffs had the Credit Builder loan reported by the credit reporting agencies and it negatively impacted Plaintiffs' borrowing power and credit worthiness. These credit reports caused a substantial reduction to the Plaintiffs' credit scores. Through their reporting of these void loans, Defendants dampened Plaintiffs' credit scores and/or purchasing power.

146.  Because of this indebtedness and credit reporting, Plaintiff SSG Burkhardt is currently in jeopardy of losing his security clearance and being involuntarily separated from the Army. Both Plaintiffs are very concerned that the unpaid loans and excessive debt will result in the loss of SSG Burkhardt's security clearance and result in his termination from the military.

147.  Plaintiffs' dampened credit scores and the debt related to their loans causes them stress, anxiety, embarrassment, annoyance, and lost credit opportunities.

148. The amount of this debt, and any subsequent default, increases the risk that Plaintiff SSG Burkhardt's security clearance will be negatively impacted.

149. The amount of this debt, and any subsequent default, will likely negatively impact Plaintiff SSG Burkhardt's military readiness.

150. The amount of this debt, and any subsequent default, will likely negatively impact Plaintiff SSG Burkhardt's financial readiness.

151. The amount of this debt, and any subsequent default, could cause Plaintiff SSG Burkhardt to be involuntarily separated from the military.

152. The Plaintiffs' loan agreements with Defendants required them to pay $1,155.54 over 12 months, in addition to the $19.99 monthly fee, which required Plaintiffs to pay $1,395.42 in total. The APR on that loan is more than 66%.

153. The loan agreements for the "Credit Builder" loans required Plaintiffs to pay interest as defined by the MLA and required them to make regular monthly payments.

## CLASS ALLEGATIONS

154. Plaintiffs bring this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

155. The proposed "MLA Class" is a nationwide class to be represented by the Plaintiffs and is defined as:

> All active duty servicemembers and/or their spouses who obtained an Instacash loan or Credit Builder loan from Defendants within the five (5) years prior to the filing of the initial Complaint through the date notice is disseminated.

156. The proposed "Florida Subclass" is to be represented by Plaintiffs and is defined as:

> All Florida consumers who obtained an Instacash loan or Credit Builder loan from Defendants within the five (5) years prior to the filing of the initial Complaint through the date notice is disseminated.

157. Expressly excluded from the Class[4] are: (a) any Judge presiding over this action and members of their immediate families; (b) Defendants and any entity in which Defendants have a controlling interest, or which has a controlling interest in Defendants, and their legal

---

[4] The MLA Class and the Florida Subclass are referred to collectively as the "Class."

representatives, assigns and successors; and (c) all persons who properly execute and file a timely request for exclusion from the Class.

158.  The Class Period ("Class Period") is five (5) years prior to the filing of the initial Complaint until the date notice is disseminated.

159.  Plaintiffs reserve the right to amend the Class definition if further investigation and discovery indicates that the Class definition should be narrowed, expanded, or otherwise modified.

## **Rule 23 Criteria**

160.  <u>Numerosity</u>. Because Defendants target military consumers as set forth above, and because Defendants have collectively extended millions of dollars to approximately 18 million people,[5] Plaintiffs believe that there are at least 100 Class members. Joinder of this many Class members would be impracticable. The exact number of Class members is unknown, as such information is in the exclusive control of Defendants. However, the number of Class members can be easily determined through Defendants' business records. Specifically, this can be determined by obtaining a list of persons who paid interest on a loan extended by Defendants during the Class Period and running those

_____

[5] https://www.moneylion.com/ (last visited May 22, 2025).

names through the DoD's MLA database created to verify covered members and their dependents. Upon information and belief, the Defendants maintain the information electronically that is required to generate such a list necessary to identify the members of the Class.

161. <u>Commonality</u>. Common questions of law and fact affect the rights of each Class member and common relief by way of damages is sought for Plaintiffs and Class members. Common questions of law and fact that affect the Class members include, but are not limited to:

a.    Whether Defendants entered into standard-form agreements with servicemembers and their dependents;

b.    Whether Defendants' Instacash and Credit Builder loans are an extension of consumer credit under the MLA;

c.    Whether Defendants violated 10 U.S.C. § 987(a) of the MLA by requiring covered members and their dependents like Plaintiffs to pay interest that exceeded the statutory rate cap of 36% MAPR;

d.    Whether Defendants violated 10 U.S.C. § 987(e) of the MLA by requiring that Plaintiffs and the Class provide their bank

accounts as security for the obligation in Defendants' Instacash loans that exceed 36% MAPR;

e.    Whether Defendants' standard form agreements extended to Plaintiffs and the Class are void from inception as a result of the MLA violations; and

f.    The remedies and damages to which Plaintiffs and the Class are entitled under 10 U.S.C. § 987(f)(5).

162.    Typicality. The claims and defenses of the representative Plaintiffs are typical of the claims and defenses of the Class because they are covered members and dependents under the MLA like the rest of the Class and their claims arise under the same legal theories and out of a common course of conduct. Plaintiffs obtained the same Instacash and Credit Builder loan products as the Class members. These loan products uniformly require the payment of interest that exceeds 36% MAPR, and uniformly require Plaintiffs and the Class to provide their bank accounts as security for the obligation of the Instacash loans, both of which are prohibited by the MLA. As a result, these loans are void from inception, and Plaintiffs suffered statutory and actual damages of the same type and in the same manner as the Class they seek to represent. There is

nothing peculiar about Plaintiffs' claims when compared to those of the other members of the Class.

163. <u>Adequacy</u>. Plaintiffs will fairly and adequately assert and protect the interests of the Class. As active duty military servicemembers and their dependents, Plaintiffs are "covered members" or "dependents" as defined under section 987(i)(1)(2) of the MLA. Plaintiffs have no conflict of interest with the Class members they seek to represent. They have hired attorneys who likewise have no conflicts of interest with the Class and who are experienced in prosecuting class actions, consumer protection law claims and MLA claims in particular, and will adequately represent the interests of the Class.

164. <u>Predominance and Superiority</u>. A class action provides a fair and efficient method for the adjudication of this controversy for the following reasons:

a. The common questions of law and fact set forth herein predominate over any questions affecting only individual Class members. The statutory claims under the MLA require a simple identification of those consumers who were also covered members and/or dependents at the time of their

transaction, which can be accomplished by using the MLA database maintained by the DoD;

b.    Prosecution of separate actions by each individual member of the Class would create a risk of inconsistent and varying adjudications against Defendants;

c.    Most covered members and/or dependents are unaware that their loans are void under the MLA, TILA and/or Florida usury law;

d.    Adjudication with respect to individual members of the Class could, as a practical matter, be dispositive of any interest of other members not parties to such adjudication, or substantially impair their ability to protect their interests;

e.    Defendants extended hundreds of loans in this District and violated the MLA hundreds of times within this District, making this Court appropriate for the litigation of the claims of the entire Class;

f.    There are very few attorneys in the United States with any expertise or experience in this nascent area of law making it

nearly impossible for Class members to find adequate representation; and

g.   The novelty of these claims and the fact that individual damages may be modest in comparison to the time required to litigate the case make a class action the only viable procedural method of redress in which Class members can, as a practical matter, recover for the conduct at issue. In fact, the vast majority of Class members are not even aware that they have a claim.

165.   Defendants acted and refused to act on grounds generally applicable to the Class, thereby making declaratory relief and corresponding final injunctive relief under Rule 23(b)(2) appropriate with respect to the Class as a whole.

166.   The MLA explicitly states that a creditor "may not impose an annual percentage rate of interest greater than 36 percent with respect to the consumer credit extended to a covered member or a dependent of a covered member." 10 U.S.C. § 987(b).

167.   The MLA also explicitly states that it "shall be unlawful for any creditor to extend consumer credit to a covered member or dependent

of such a member with respect to which . . . the creditor uses a check or other method of access to a deposit, savings, or other financial account maintained by the borrower, or the title of a vehicle as security for the obligation." 10 U.S.C. § 987(e)(5).

168. Additionally, Defendants' loan terms are standardized for each proposed Class, meaning that all Class members were subjected to the same unlawful terms and suffered the same types of harm arising from materially identical agreements. The MLA's protections are not contingent on individual reliance, but on whether the creditor imposed prohibited terms. Because Defendants' MLA violations are uniform, the Class mechanism is the only practical way to vindicate servicemembers' rights.

169. Plaintiffs and the Class are entitled to a declaration that their contracts are void, and Defendants should be enjoined from attempting to collect any monies pursuant to them or to enforce them in any way.

170. Florida law also mandates that no person shall extend a loan to a consumer that exceeds 18% APR. Defendants' loan terms are standardized for each proposed Florida Subclass member, meaning that all Florida Subclass members were subjected to the same unlawful terms

and suffered the same type of harm arising from materially identical loans extended by the Defendants. Florida's usury law protections are not contingent on individual reliance, but on whether the creditor imposed prohibited terms. Because Defendants' usurious loan violations are uniform, the Class mechanism is the only practical way to vindicate the Florida Subclass members' rights.

## COUNT I
### Violation of the Military Lending Act 10 U.S.C. §§ 987, *et seq.* On Behalf of the Class

171.  Plaintiffs and the Class repeat and re-allege the allegations contained in paragraphs 1 through 170 as if set forth herein in full.

172.  Plaintiff SSG Johnathan Burkhardt was serving as an active-duty member of the United States Army at the time of entering into the loan contracts with Defendants, and on the date that the Instacash loans and Credit Builder loans were extended by Defendants.

173.  Plaintiff SSG Burkhardt and his wife, Plaintiff Deven Burkhardt, were "covered borrowers," "covered members" and "dependents" as those terms are defined by 32 C.F.R. § 232.3(g).

174.  Members of the putative Class are also those individuals who were active duty servicemembers and/or their spouses on the date they

53

received their Instacash loans and Credit Builder loans extended by Defendants.

175.  Each loan extended by Defendants to Plaintiffs and the Class were for personal, family, or household purposes and contain a "finance charge" and/or were payable by written agreement in more than four installments.

176. Each Defendant is a "creditor" that provided "consumer credit" to Plaintiffs and the Class as those terms are defined in 32 C.F.R. §§ 232.3(f), (h) & (i).

177. The MLA § 987(a) states that a creditor, like Defendants, "shall not require the member or dependent to pay interest with respect to the extension of such credit" that contains terms prohibited by the MLA. 10 U.S.C. § 987(a). The MLA defines "interest" to include:

> all cost elements associated with the extension of credit, including fees, service charges, renewal charges, credit insurance premiums, any ancillary product sold with any extension of credit to a servicemember or servicemember's dependent, as applicable, and any other charge or premium with respect to the extension of consumer credit.

10 U.S.C. § 987(i)(3).

178.  Sections 987(b) and (e)(5) of the MLA prohibit interest rates that exceed 36% MAPR and also prohibit the requirement that a

consumer provide their bank account as security for the obligation of a loan that exceeds 36% MAPR in extensions of consumer credit by creditors, like Defendants, to covered borrowers, like Plaintiffs. 10 U.S.C. § 987(b) and (e)(5):

> (b) A creditor described in subsection (a) may not impose an annual percentage rate of interest greater than 36 percent with respect to the consumer credit extended to a covered member or a dependent of a covered member;

> (e) It shall be unlawful for any creditor to extend consumer credit to a covered member or a dependent of such a member with respect to which—

> (5) the creditor uses a check or other method of access to a deposit, savings, or other financial account maintained by the borrower, or the title of a vehicle as security for the obligation.

179.  Thus, Defendants violate MLA § 987(a) by requiring covered borrowers to pay interest on their loans which contain prohibited interest rates and for the Instacash loans that require covered borrowers to provide their bank account as security of the obligation for a loan that exceeds 36% MAPR.

## MAPR VIOLATION

180.  The MLA prohibits "interest" above a 36% MAPR. 10 U.S.C. § 987(b).

181. As explained above, the charges Plaintiffs and the Class paid in connection with their Instacash and Credit Builder loans increased the costs of those loans and therefore are "interest" under the MLA.

182. Those charges also violate the MLA because they uniformly exceeded the MLA's 36% MAPR.

183. Plaintiffs and all Class members who were required to and did pay interest on their Instacash loans and Credit Builder loans with Defendants were damaged as a result of the unlawful extension of consumer credit in violation of 10 U.S.C. § 987(a).

184. Further, MLA § 987(e) makes it a separate MLA violation for Defendants to extend consumer credit to Plaintiffs and the Class through the use of standard form loan agreements, which all contain interest rates and/or terms which require the covered member and/or their dependent to provide their bank account as security for the obligation in the loan.

## SECURITY INTEREST VIOLATION

185. The MLA prohibits creditors from requiring that covered members and their dependents provide their bank account as security for

the obligation when a loan exceeds the statutory rate cap of 36% MAPR. 10 U.S.C. § 987(e)(5) and 32 C.F.R. 232(8).

186. Defendants' standard-form agreements for the Instacash loans include security interest provisions with no exception for covered borrowers under the MLA, including the agreements entered into with Plaintiffs that exceed 36% MAPR.

187. As a result of unlawfully requiring covered borrowers like Plaintiffs and the Class to enter into loans which require them to provide their bank account as security for a loan obligation that exceeds 36% MAPR in violation of 10 U.S.C. § 987(e)(5) of the MLA, the Instacash loans that Defendants extended to the Plaintiffs and the Class are "void from inception" pursuant to 10 U.S.C. § 987(f)(3) and 32 CFR § 232.9(c).

188. This is the same type of concrete harm that Congress sought to prevent when it implemented the MLA.

**REMEDIES**

189. Defendants' MLA violations occurred when they charged interest on loans with MLA-violative interest rates and for Instacash loans that required Plaintiffs and the Class to provide their bank accounts as security for the obligation in a loan that exceeds 36% MAPR.

As a result, the loans that Defendants extended to Plaintiffs and the Class are void as a matter of law.

190.  Defendants required Plaintiffs to pay interest on Defendants' void loan agreements.

191.  Plaintiffs paid interest on Defendants' void loan agreements.

192.  Each of Defendants' MLA violations are separate and independent under the MLA.

193.  Each time that Plaintiffs paid money on Defendants' void loans constitutes a separate and independent violation under the MLA and damages caused by Defendants' unlawful MLA conduct.

194.  Each and every time that Defendants assessed interest on their void loans to Plaintiffs and the Class restarts the statute of limitations under the MLA.

195.  The remedy to cure Defendants' violations of the MLA is voiding the loans of Plaintiffs and the Class "from inception," pursuant to 10 U.S.C. § 987(f)(3) and 32 CFR § 232.9(c).

196.  10 U.S.C. § 987(f)(5) and 32 CFR § 232.9(e)(1) further provide that Plaintiffs and each member of the Class are entitled to actual damage sustained but not less than $500.00 for each separate violation

of the MLA, plus appropriate punitive damages, injunctive or declaratory relief, and any other available relief.

197.  The Defendants are also liable for Plaintiffs' attorneys' fees and costs pursuant to 32 CFR § 232.9(e)(2) and 10 U.S.C. § 987(f)(5)(B).

## COUNT II
### Violation of Florida Usury Statute § 687.02
### On Behalf of the Florida Subclass

198.  Plaintiffs and the Class repeat and re-allege the allegations contained in paragraphs 1 through 170 as if set forth herein in full.

199.  The Defendants' Instacash and Credit Builder loans extended to Plaintiffs and the Florida Subclass violate the Florida usury statute as the Defendants loans are "usurious contract[s]." Fla. Stat. § 687.02.

200.  Specifically, Fl. Stat. § 687.02 states, "[a]ll contracts for the payment of interest upon any loan, advance of money, line of credit, or forbearance to enforce the collection of any debt, or upon any obligation whatever, at a higher rate of interest than the equivalent of 18 percent per annum simple interest are hereby declared usurious."

201.  Plaintiffs' Instacash and Credit Builder loans are "loans" or "advances of money."

202.  Plaintiffs' Instacash loans included charges (labeled as "Turbo Fees" and "Tips") equivalent to loans with interest rates of 495% or more, compared to the 18% interest cap under Florida law, which is more than 27 times greater than what Florida law allows.

203.  Plaintiffs' Credit Builder loans included charges (labeled as "Finance Charges" and "Monthly Membership Fees") that made the loan terms equivalent to loans with interest rates of 66% or more, compared to the 18% interest rate cap under Florida law, which is more than three times greater than what Florida law allows.

204.  Under Florida Statute § 687.04, Defendants must "forfeit the entire interest so charged or contracted to be charged" to the Plaintiffs and the Florida Subclass.

205.  Further, Plaintiffs and the Florida Subclass are entitled to recover double the amount of interest that they paid.

206.  Defendants also violated Fl. Stat. § 687.071, which governs "criminal usury" and "loan sharking." Under that statute, "any person making an extension of credit to any person, who shall willfully and knowingly charge, take, or receive interest thereon at a rate exceeding 45 percent per annum or the equivalent rate for a longer or shorter period

of time, whether directly or indirectly or conspire so to do, commits a felony of the third degree." Here, Defendants engaged in a criminal act. Under the statute, "[n]o extension of credit made in violation of any of the provisions of this section shall be an enforceable debt in the courts of this state." Plaintiffs and the Class request a declaration that their loans are void and unenforceable, as they exceeded Florida's loan sharking rate cap of 45% interest.

207. As a direct and proximate result of Defendants' violation of Florida's usury statute, Plaintiffs and the Florida Subclass have been injured, and the Plaintiffs are entitled to an award of monetary damages and declaratory and injunctive relief.

## COUNT III
### Violation of the Truth In Lending Act 15 U.S.C. §§ 1601, *et seq.* On behalf of the Class

208. Plaintiffs and the Class repeat and re-allege the allegations contained in paragraphs 1 through 170 as if set forth herein in full.

209. Through their Instacash loans, Defendants extend credit to borrowers, and borrowers, in return, are required to authorize Defendants to debit their bank accounts on payday, in an amount equal

to the credit extended and any "Turbo Fees" or "Tips" charged to the borrower.

210.  Through their Credit Builder loans, Defendants extend credit to borrowers and require them to pay "Monthly Membership Fees," and consumers repay the Credit Builder loan in monthly installments.

211.  These transactions are "credit" under TILA, as Defendants grant consumers the right to defer payment of debt or incur debt and defer its payment. 15 U.S.C. § 1602(f). Plaintiffs incurred debt for InstaCash and Credit Builder loans the repayment of which was deferred under the terms of the repayment agreements.

212.  The charges that Defendants impose as an incident to its loans—"Turbo Fees," "Tips," and "Monthly Membership Fees"—qualify as "Finance Charges" because those charges have a close connection to the extension of credit. *Id.* § 1605(a).

213.  Because Defendants' Instacash and Credit Builder loans are "credit," and because Defendant imposes "finance charges" in connection with those credit transactions, Defendants are "creditors," Plaintiffs' and the Class's loans are "consumer credit transactions," and Plaintiffs,

Defendants, and the Class members are "persons" within the meaning of TILA. *Id.* §§ 1602(e), (g), (i); *id.* § 1638(a).

214.  TILA requires "creditors," like Defendants, to disclose, among other things, the "finance charge" and "annual percentage rate" (if the finance charge exceeds certain amounts). *Id.* §§ 1638(a)(2), (3), (4), (5).

215.  For Instacash loans, Defendants do not disclose the "finance charge" or "annual percentage rate."

216.  For the Credit Builder loans, Defendants fail to accurately disclose the "finance charge" or "annual percentage rate."

217.  As a result of Defendants' refusal to comply with TILA and their systematic violation of the various disclosures required in each of their numerous cash advance transactions, Defendants are liable to Plaintiffs and the Class members in an amount equal to actual damages, statutory damages, costs, reasonable attorneys' fees, and all other available relief. 15 U.S.C. §§ 1640(a), (e).

## **REQUESTED RELIEF**

Plaintiffs respectfully request that this Court enter order and judgment as follows:

A.   An order certifying this action to proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiffs as Class Representatives, and appointing the undersigned as Class Counsel;

B.   A judgment declaring Plaintiffs' and the Class members' loans void from inception because they violate the MLA and awarding Plaintiffs and the Class the equitable, declaratory and injunctive relief set forth in 10 U.S.C. § 987;

C.   A judgment awarding Plaintiffs and Class members actual damages paid in connection with or pursuant to the illegal and void loans not less than $500.00 per MLA violation, together with appropriate punitive damages pursuant to 10 U.S.C. § 987(f)(5)(A);

D.   A judgement awarding Plaintiffs and Class members all of the damages allowed by 15 U.S.C. § 1640.

E.   A judgment awarding Plaintiffs and the Class reasonable attorneys' fees and costs incurred in this action pursuant to 10 U.S.C. § 987(f)(5)(B) and 15 U.S.C. § 1640;

F.    A judgment awarding Plaintiffs and the Florida Subclass actual damages and double the amount of any interest that they paid to the Defendants;

G.    A judgment awarding Plaintiffs and the Class all pre-judgment and post-judgment interest recoverable at law or in equity; and

H.    A judgment awarding Plaintiffs and the Class such other and further relief to which they are justly entitled.

## JURY TRIAL DEMAND

Plaintiffs and the Class demand a jury trial on all issues so triable.

Date: May 22, 2025                    Respectfully submitted,

**VARNELL & WARWICK, P.A.**

/s/ Janet R. Varnell
Janet R. Varnell; FBN: 0071072
Brian W. Warwick; FBN: 0605573
Christopher J. Brochu; FBN: 1013897
Jeffrey L. Newsome, FBN: 1018667
Pamela Levinson, FBN: 538345
400 N. Ashley Drive, Suite 1900
Tampa, Florida 33602
Telephone: (352) 753-8600
Facsimile: (352-504-3301
jvarnell@vandwlaw.com
bwarwick@vandwlaw.com
cbrochu@vandwlaw.com
jnewsome@vandwlaw.com
plevinson@vandwlaw.com
ckoerner@vandwlaw.com

jesquibel@vandwlaw.com
service@vandwlaw.com

**EAST END TRIAL GROUP LLC**
Kevin Abramowicz*
Kevin Tucker*
Chandler Steiger*
Jessica Liu*
6901 Lynn Way, Suite 503
Pittsburgh, PA 15208
Telephone: (412) 223-5740
Facsimile: (412) 626-7101
kabramowicz@eastendtrialgroup.com
ktucker@eastendtrialgroup.com
csteiger@eastendtrialgroup.com
jliu@eastendtrialgroup.com

*Pro Hac Vice Application
Forthcoming

***Counsel for Plaintiffs and the Class***