# EXHIBIT C



# A LOAN SHARK IN YOUR POCKET:

## The Perils of Earned Wage Advance

Candice Wang, Senior Researcher
Lucia Constantine, Senior Researcher
Monica Burks, Policy Counsel
Yasmin Farahi, Deputy Director of State Policy & Senior Policy Counsel

October 2024



www.responsiblelending.org

## About The Center for Responsible Lending (CRL)

The Center for Responsible Lending (CRL) is a non-partisan, nonprofit research and policy advocacy organization working to promote financial fairness and economic opportunity for all, end predatory lending, and close the racial wealth gap. CRL's expertise gives it trusted insight to evaluate the impact of financial products and policies on the wealth and economic stability of families of color, rural, women, military, low-wage, low-wealth, and early-career workers and communities. CRL is an affiliate of Self-Help, one of the nation's largest nonprofit community development financial institutions. We work in partnership with national and local consumer, faith, and civil rights organizations.

## About the Authors

Candice Wang is a senior researcher at the Center for Responsible Lending. Candice brings experience in education nonprofit work and user experience research in higher education and from the insurance industry. She graduated with bachelor's degrees in neuroscience and religious studies from Pomona College before earning a doctorate degree in cognitive neuroscience from Duke University.

Lucia Constantine is a senior researcher at the Center for Responsible Lending. Prior to working with CRL, Lucia was a senior policy analyst at the North Carolina Housing Finance Agency, where she performed data analysis and research to understand gaps in affordable housing across the state and inform use of state and federal funds. Before her work in affordable housing, she spent her early career in nonprofits and higher education, focused on issues related to immigration, civic engagement, and economic development. She graduated with a bachelor's degree in human biology from Stanford University and a master's degree in city and regional planning from the University of North Carolina-Chapel Hill.

Monica Burks serves as policy counsel on CRL's state policy team. Based in the Durham office, she works with local organizations and lawmakers to end abusive lending practices in their states. She graduated from NC State with a degree in creative writing. Monica attended Carolina Law, focusing her legal scholarship on banking law and housing rights. Prior to entering academia, Monica worked as a credit union loan officer and administrator for four years. After graduating from law school in 2018, she worked as a law clerk for the North Carolina Supreme Court. Prior to joining CRL, Monica was a commercial real estate attorney.

Yasmin Farahi is a deputy director of state policy and senior policy counsel based out of CRL's Durham, North Carolina office. She advises local organizations and lawmakers that are working to eliminate abusive lending practices in their states, with a particular focus on small dollar lending and student loans. Prior to joining CRL, Yasmin was a civil rights attorney at Disability Rights NC working with clients who faced barriers to full participation in community life. She was also a consumer protection and employment law attorney at Legal Services of Southern Piedmont in Charlotte, NC, focused on helping homeowners facing foreclosure during the financial crisis. Yasmin graduated with honors from NC State University with degrees in political science and philosophy and received her law degree from New York University School of Law.

## Acknowledgments

The authors express their gratitude to SaverLife for their collaboration on this project and for their invaluable assistance in facilitating our engagement with their transactions data. The authors would also like to acknowledge Ellen Harnick, Matthew Kravitz, Andrew Kushner, and Sara Weiss for their contributions.

# Contents

Executive Summary .................................................................................................................................... 4

Key Findings ................................................................................................................................................. 4

Current Policy Landscape ........................................................................................................................... 5

    Federal Level ........................................................................................................................................... 5

    State Level ............................................................................................................................................... 5

Methodology ................................................................................................................................................ 6

Findings ........................................................................................................................................................ 7

    Many EWA Borrowers Are Trapped in a Debt Cycle and the Heaviest Users
Drive the Business Model ...................................................................................................................... 7

    Earned Wage Advance Use Is Associated with Increased Overdraft Fees and Payday Loan Use ............ 8

    Consumers Across States Are Experiencing Similar Harms ............................................................... 9

Conclusion ................................................................................................................................................. 10

Endnotes .................................................................................................................................................... 11

# Executive Summary

Online lenders offering earned wage and cash advances primarily through cell phone apps have proliferated in the past decade, with companies claiming that existing credit laws do not apply to their products. As a result, consumers have not been made aware of the true costs and potential harms of advances. Research by CRL and others has demonstrated using these fintech cash advances leaves many consumers worse off—paying high fees for small loans, increasing their risk of overdraft, and having to reborrow paycheck after paycheck. Usage patterns, associated harms, and revenue generation models of earned wage advance (EWA) are similar to those of traditional payday lending, but EWA borrowers can be even more easily ensnared in a debt trap when taking out loans with a few taps on their cell phones.

In 2024, regulators and legislators across the country have been barraged with lobbying from the fintech advance industry aiming to create loopholes for their high-cost loan product. While some banking regulators have recognized fintech cash advances as credit products subject to their laws, state legislatures have been flooded with industry-backed bills that claim that these products are not loans and should not be subject to state credit laws. With the release of a new proposed interpretive rule, the Consumer Financial Protection Bureau (CFPB) clarified that EWA advances are consumer loans subject to the Truth in Lending Act (TILA), which allows customers to compare options by requiring lenders to disclose the cost and fees. Going into a new year with this guidance, state legislators and regulators should strengthen and enforce their own lending laws to protect consumers.

This research report provides an update to the Center for Responsible Lending's recent publications on earned wage and cash advance, Paying to Be Paid and Not Free. It offers new research insights and explains recent regulatory developments at the federal and state level.

| Key Findings Include: |

1    **Many EWA borrowers are trapped in a debt cycle and the heaviest users drive the business model.** Repeat use of advances is common, and high-frequency users accounted for 38% of users and 86% of advances.

2    **Earned wage advance use is associated with increased overdraft fees and payday loan use.** For EWA users with overdraft fees or payday loans, the majority saw the number of times they used these high-cost products increase after taking out an advance for the first time.

3    **Consumers across states are experiencing similar harms.** The 18 states we analyzed had similar patterns of repeat borrowing, loan stacking, and overdraft use.

# Current Policy Landscape

## Federal Level

In July 2024, the CFPB issued a proposed interpretive rule confirming that paycheck advance products are subject to the federal Truth in Lending Act (TILA). The proposed rule affirms that paycheck advance loans, regardless of their characterization by lenders, are credit products subject to TILA disclosure requirements, and that tips and expedite fees are finance charges. The proposed interpretive rule rescinded a 2020 advisory opinion published by the CFPB, which exempted a very narrow class of EWA loans from the scope of TILA. This earlier advisory opinion was misused by EWA lenders to mislead state legislatures into believing that the CFPB had determined that EWA loans are not extensions of credit subject to credit laws. The substance of the interpretive rule was supported by a robust analysis of millions of transactions furnished to the CFPB by eight companies that issue EWA loans.

This rule provides much needed clarity around the regulation of these credit products and gives consumers the transparency in costs that they are entitled to but have been deprived of to date. The proposed interpretive rule and findings provide expert, well-reasoned analysis and guidance for state regulators and lawmakers grappling with how to apply existing credit laws to EWA. During the open comment period, CRL submitted a joint letter with the National Consumer Law Center praising the CFPB, providing suggestions to strengthen the rule, and highlighting anticipated evasions that may require additional rulemaking and enforcement action.[1] Over 160 consumer, labor, civil rights, faith-based, and community organizations also submitted a letter in support of the rule.[2] The attempt by EWA lenders to claim their advances are not loans mirrors that of the payday lenders, who long argued that they were only making advances, not loans. The Federal Reserve summarily dismissed that charade, holding that payday lenders were making loans, and these were subject to TILA and other credit laws.

In addition, industry has backed a bill in the House of Representatives that would exempt EWA loans from TILA. That bill has not advanced to a floor vote.

## State Level

Our 2023 policy brief *Paying to be Paid: Consumer Protections Needed for Earned Wage Advances and Other Fintech Cash Advances* offered a detailed update of the state regulatory landscape on fintech cash advances. Since that time, industry has continued its efforts to gain exceptions to lending laws in states through legislative advocacy as regulators and lawmakers have considered how to regulate these lenders under their state credit laws.

This year, several states with strong consumer protection laws took steps to clarify, enforce, and maintain their lending laws in the face of industry pressure to create loopholes for their predatory product. In 2023, Connecticut confirmed that its credit laws apply to EWA products through both regulatory guidance and passage of a credit code modernization law, and Maryland issued regulatory guidance confirming that some EWA products are covered by its consumer laws.[3] Connecticut's new law went into effect on January 1, 2024, resulting in a shift in the marketplace there, with lenders offering only products that comply with the rate cap for all small dollar loans in the state.[4] In July 2024, Maryland opened an investigation into EWA and requested data from several EWA companies on their operations; the stated aim of the inquiry is to enforce existing state laws. California continued consideration of its proposed regulations that clarified that EWA and other fintech cash advance products are loans.

The 2024 legislative season also saw industry-backed bills introduced in states across the country, and three additional states passing industry-backed EWA bills, joining Nevada and Missouri. South Carolina and Kansas codified the high-cost business model, permitting various fees, subscription charges, and tips—with no cost limitations—and adopting the legal fiction that EWA is not a loan. Wisconsin also passed an EWA bill, authorizing limitless fees and tips without declaring whether EWA is a loan under its laws. Like Nevada and Missouri, these three states still allow traditional payday loans with triple digit APRs and have generally weak consumer protection laws. Thus, the bills simply add another triple-digit APR loan product to the payday loans currently permitted, and therefore do not undermine real-world consumer protections for borrowers under the law of these states. Lenders in these states must still comply with TILA disclosure requirements per the CFPB proposed interpretive rule discussed above.

Additional details on the state regulatory landscape can be found in the updated policy brief *Paying to be Paid: Consumer Protections Needed for Earned Wage Advances and Other Fintech Cash Advances* (October 2024).

## Methodology

In a previous report on earned wage and cash advance, *Not Free: The Large Costs of Small-Dollar Loans Made Through Cash Advance Apps,* CRL used a mixed-methods approach to examine the costs, usage patterns, and impact of taking out cash advances. We analyzed financial transactions data from a panel of low- to-moderate income consumers affiliated with SaverLife, a nonprofit that uses technology to improve financial health. Additionally, we did a three-week qualitative study in which 14 participants used an online discussion forum to answer questions about their experiences. Our findings showed that consumers using direct-to-consumer EWA experienced more overdraft fees; took out advances repeatedly, with many taking out an advance on the same day or day after making a repayment; and paid an average APR of 367% for small loans.[5]

The analysis in this research report builds on CRL's previous research on EWA. Our previous research was limited to a subset of consumers within the panel and focused on five direct-to-consumer lenders. In this research update, we use the same financial transactions data but expand our analysis to include a larger sample of consumers using both direct-to-consumer and employer-based EWA, and more companies, across a longer timeframe from January 2021 through June 2024. EWA users were identified by creating filters for deposits containing company names for 10 direct-to-consumer lenders and 10 employer-integrated lenders.[6]

**Table 1. Total Advances and Users by EWA Type**

|  | Total | Direct-to-Consumer | Employer-Integrated |
|---|---|---|---|
| Number of Advances | 214,093 | 171,002 | 43,091 |
| Number of Users | 5,848 | 5,414 | 1,066 |

Note: 632 users used both direct-to consumer and employer-integrated EWA.

This latest research corroborates findings around repeat borrowing, loan stacking, and overdraft fees while providing novel insights into concurrent use of EWA and payday loans. Additionally, we look at 18 states that had at least 50 SaverLife members using EWA to understand impacts at the state level. We also examine the fees and tips users incurred with one direct-to-consumer lender that uses a tip-based model, EarnIn.

# Findings

**Many EWA borrowers are trapped in a debt cycle and the heaviest users drive the business model**

For many workers, earned wage advance fails to solve their short-term liquidity problems, but rather traps them in a cycle of debt. Consistent with the CFPB's recent data report, we found that a substantial share of users took out advances every pay period, with 27% of users taking out 25 or more advances per year.[7] For one in three (33%) EWA users, 80% or more of the advances they took out were followed by reborrowing within two weeks. As many workers are paid on a bi-weekly basis, this suggests that receiving a reduced paycheck because of EWA necessitated taking out more advances in the next pay period. This is how payday loans work, with the initial loan being rolled over or renewed multiple times.[8]



**1 in 3 users reborrowed within 2 weeks at least 80% of the time.**

The success of EWA companies is predicated on the fees collected with frequent and repeat advances that create a debt trap for borrowers. Although business models vary slightly, lenders earn money through a variety of fees including transaction fees, expedite fees, and subscription fees to access services. Most companies charge a fee to transfer money instantly—ranging from $0.99 to $25 depending on the size of the advance—which capitalizes on most borrowers' immediate need for cash. Several companies (Dave, EarnIn, and MoneyLion) also solicit tips from users of up to $13 per advance.[9] Previous research from the California Department of Financial Protection and Innovation found that tip-based EWA providers received tips for 73% of all transactions.[10] By imposing limitations on how much can be borrowed in a single advance, while allowing more than one advance per pay period, lenders force borrowers to take out multiple advances—and pay multiple fees—to access more money. The business model capitalizes on most borrowers' financial precarity, and the user interface of these products makes paying a fee or leaving a tip difficult to avoid.

High-frequency users accounted for the majority of transactions; users with at least six advances in one or more months accounted for 38% of all users and 86% of all advances. Trapping these consumers in a cycle of debt is a key strategy for generating revenue through fees and tips, like that of the payday loan industry. According to Dave's presentation to investors, each advance generates $9.20 in revenue on average.[11] Public filings from Dave, one of the only publicly traded EWA companies, show that 81% of



**Users with 6+ transactions in 1 or more months account for 38% of all users and 86% of all EWA advances.**

their revenue in 2023 came from fees and tips associated with cash advances. Specifically, Dave reported $259.1 million in revenue, earning $152.5 million in fees (59% of revenue) and $59.9 million in tips (22% of revenue).[12] Although not publicly traded, EarnIn has said in public testimony that 40% of its revenue comes from tips alone.[13] CRL's analysis of EarnIn transactions in the SaverLife panel shows that the amount of fees and tips paid was highly correlated with the number of advances: Consumers who took out more advances paid more in fees and tips. Moreover, the heaviest EarnIn users—those who took out six or more advances per month—accounted for 22% of all users but paid 62% of expedite fees and tips.

## A Closer Look at EarnIn

### High-Frequency Borrowers Are Paying the Majority of Fees and Tips 

To better understand expedite fees and tips, which are clarified as finance charges in CFPB's new interpretive rule, we conducted additional analysis focused on direct-to-consumer EWA provider EarnIn, whose primary sources of revenue are expedite fees and tips.[14] EarnIn consumers in this sample paid expedite fees and tips totaling $230,785 for 45,123 advances.[15] Consistent with findings in our previous report, the average cost per advance for EarnIn was around $5 for an average advance of $80 for nine days. EarnIn users who took out more advances paid more in expedite fees and tips. We found that 286 out of 1,312 EarnIn users took out an average of six or more advances per month from EarnIn alone. Even though these high-frequency EarnIn users accounted for only 22% of all EarnIn users in the sample, they accounted for 61% of all EarnIn advances and paid 62% of the expedite fees and tips. These findings parallel established consensus about the business model of the payday loan industry, where most of the revenue comes from a small number of high-frequency borrowers caught in a cycle of debt.

Taking advances from multiple companies within the same month was also prevalent and is cause for concern. Loan stacking increases the costs of advances and compounds borrowers' risk of overextending themselves. In our sample, nearly half of all EWA borrowers had used multiple companies in the same month; 22% of EWA users had used two apps in the same month, while 27% had used three or more in the same month. In the most extreme case, one worker used eight different EWA apps in the same month. Using multiple apps leaves workers with less money on payday, making it harder to meet expenses.

Neither EWA lenders nor employers have protections in place to ensure the same wages are not pledged to multiple lenders. Roughly two in five employer-integrated EWA users (39%) also took out advances from direct-to-consumer EWA providers during the same month, while 11% did so for at least half the months they used employer-integrated EWA. Concurrent use of multiple EWA apps means borrowers are paying more in fees to take out amounts that may be unsustainable and are risking further financial distress when multiple loans become due at the end of the pay cycle.



**39% of employer-integrated EWA users also used direct-to-consumer EWA in the same month.**

### Earned Wage Advance Use Is Associated with Increased Overdraft Fees and Payday Loan Use

EWA providers tout their products as "overdraft fee eliminators" and "payday loan killers."[16] However, our research found evidence of the opposite. In line with findings from CRL's previous research, we found that overdrafts on consumers' checking accounts increased on average following use of an advance product. Our previous report found that the number of overdrafts increased 56% on average after use of an advance product.[17] In the updated larger sample, we found that out of EWA users who experienced overdrafts, 67% saw their overdrafts increase after initial advance use. In the most extreme case, one user incurred no overdrafts in the three months leading up to their initial EWA advance, and experienced 58 overdrafts in the three months following their initial EWA use. These overdrafts cost the borrower $1,740 in total fees.

To date, 20 states and the District of Columbia have passed laws to cap payday lending rates around 36% APR, including fees, or requiring other measures to ensure that payday lenders do not impose interest rates and financing terms that create a long-term debt trap for consumers.[18] Because of these important policy measures, many consumers are protected from predatory payday lenders. In states without strong consumer protections, payday loans and similar small loans with triple-digit APR continue to drain nearly $3 billion in fees annually.[19]

Even though only a small share of EWA users in our sample had used payday loans, those who did turned to payday lenders more often after they started to use advance products.[20] Of EWA users in states without rate caps who also used payday lenders, 58% took out more payday loans in the year following their initial EWA advance. Many of them had not previously used payday loans but then started to take out payday loans after starting to use EWA. One new EWA and payday loan user took out 15 payday loans and paid $439.79 in fees. For EWA borrowers who also used payday loans, the average number of payday loans increased from 3.1 in the year leading up to their initial advance use to 4.5 in the year following advance use. This means that EWA users who also used payday loans did not reduce their reliance on payday loans. In the most extreme case, one individual in California saw the number of payday loans increase from six in the year before their initial EWA advance to 52 in the year following initial EWA use, which drained an additional $1,996.61 in fees from their bank account.



**Figure 1. Counts of Average Number of Payday Loans Preceding and Following Advance Use**

# of payday loans in 1-year period before initial EWA: 3.1

# of payday loans in 1-year period after initial EWA: 4.5

Average number of payday loans

Source: CRL analysis of SaverLife data.

**Consumers Across States Are Experiencing Similar Harms**

We looked at repeat borrowing, loan stacking, and overdraft use for consumers in 18 states in the dataset.[21] Across the states, we found results that were consistent with national trends. First, consumers across 18 states took out advances repeatedly. The percentage of users with 25 or more advances in a year ranged from 21% in Minnesota to 36% in New York. Second, using multiple EWA apps concurrently was common. The percentage of users who had borrowed from multiple EWA companies in the same month ranged from 43% in Michigan to 57% in Massachusetts. The fees and potential harms associated with taking out multiple advances simultaneously impact consumers across different states. Lastly, in all 18 states, EWA users who experienced overdrafts did not decrease the average number of overdrafts during the three-month period after their initial advance compared to the three-month period before their initial advance. In 17 states there was an increase in the average number of overdrafts, and in one state, Virginia, there was no change. The payday loan analysis was not feasible at the state level due to the overall low incidence of payday loan use in our sample, as most of the states analyzed have rate caps of 36% or less, which protect consumers from predatory payday loans.

# Conclusion

Borrowing money that is repaid on payday is not an innovation; it is a loan. As earned wage and cash advance products have become more popular, the parallels to payday lending are striking. Like payday loans, earned wage advance can trap users in a cycle of reborrowing that increases their financial distress, while generating revenue for companies.

Our analysis shows that many users are taking advances every pay cycle and relying on multiple apps every month. The more advances a worker takes out, the more their paycheck is eroded by fees and tips. Companies' business models are predicated on consumers' need for immediate access to cash and the shortfall created by taking out an advance. For example, we found that EarnIn derived most of its revenue from fees and tips paid by a small number of high-frequency users. Furthermore, earned wage and cash advance are exacerbating borrowers' financial distress. For those users who also are incurring overdraft fees or have taken out payday loans, earned wage advance does not decrease their reliance on these high-cost products like companies claim. Instead, the majority of these users see the incidence of overdraft fees and payday loans increase.

Actions taken by the CFPB and state regulators help ensure that consumers understand the costs of these loans and can compare their options. Requiring lenders to disclose an accurate interest rate that includes fees and tips as finance charges is an important step in protecting consumers from the erosion of their hard-earned paychecks.

# Endnotes

[1] See Comment from Center for Responsible Lending (https://www.responsiblelending.org/research-publication/comment-paycheck-advance-loans-are-credit-products-and-should-be-subject)

[2] See Comment from Americans for Financial Reform Education Fund and 164 Organizations (https://www.responsiblelending.org/research-publication/165-consumer-advocacy-faith-based-racial-justice-community-advocacy-groups)

[3] For more on these changes, please see *Paying to be Paid: Consumer Protections Needed for Earned Wage Advances and Other Fintech Cash Advances*, Paying to be Paid: Consumer Protections Needed for Earned Wage Advances and Other Fintech Cash Advances | Center for Responsible Lending

[4] Data collected since January 2024 show that at least one company, Dave, is still offering loans with APRs that exceed the Connecticut interest rate cap by structuring its product as an overdraft service, rather than EWA.

[5] Not Free: The Large Hidden Costs of Small-Dollar Loans Made Through Cash Advance Apps | Center for Responsible Lending

[6] In addition to the five direct-to-consumer companies Brigit, Cleo, Dave, EarnIn, and FloatMe included in the previous report, we additionally identified advances from Albert Instant, Empower, Klover, Varo Advance, MoneyLion, and employer-integrated companies Branch, DailyPay, One@Work (formerly Even), PayActiv, Rain, Tapcheck, Immediate, Instant Financial, Wagestream, and ZayZoon.

[7] Data Spotlight: Developments in the Paycheck Advance Market | Consumer Financial Protection Bureau (consumerfinance.gov)

[8] CFPB data point: Payday lending | Consumer Financial Protection Bureau (consumerfinance.gov)

[9] What Is Earned Wage Access? - NerdWallet

[10] California Department of Financial Protection and Innovation, 2021 Earned Wage Access Data Findings (ca.gov)

[11] Dave Q2 2024 Earnings Presentation, slide 9. Average advance amount is $166, typical loan term is 1–2 weeks.

[12] Dave Inc, (2024, March 3). Form 10-K. Retrieved from http://www.sec.gov/edgar.shtml.

[13] Vt. House Comm. on Com. and Econ. (2023, February 14), *supra* note 3 at 2:16:45, available at https://www.youtube.com/clip/Ugkx7fEU-NXc2ZqgurJSRZTHXm_rpCNHzVcU

[14] EarnIn website How does EarnIn make money? – EarnIn Help Center accessed 9/18/2024

[15] We matched EarnIn advances to repayments using the transaction date, assuming that advances precede repayments and that the total amount repaid on each payday is equal to or slightly more than the total amount advanced during that pay period. If the total amount repaid on payday exceeded the total amount advanced during a pay period, the excess amount accounts for expedite fees and tips paid by the consumer. Following this method, we matched 45,123 advances from 1,312 SaverLife members. Twenty-five percent of EarnIn advances could not be matched to a repayment.

[16] DailyPay. (2024, April 13). Earned Wage Access. NCOIL Spring Meeting. https://ncoil.org/wp-content/uploads/2024/04/EWA-NCOIL-.pdf

[17] Not Free: The Large Hidden Costs of Small-Dollar Loans Made Through Cash Advance Apps | Center for Responsible Lending

[18] Red Alert Rates: Annual Percentage Rates on $400, Single-Payment Payday Loans in the United States | Center for Responsible Lending

[19] Debt Trap Drives the Fee Drain: Payday and Car-Title Lenders Drain Nearly $3 Billion in Fees Every Year | Center for Responsible Lending

[20] We identified payday loan transactions for users living in states where payday loans are legal by creating filters for major payday lenders, including Advance America, Ace Cash Express, Speedy Cash, Checksmart, Approved Cash Advance, Advance Financial, LendNation, MoneyTree, Rapid Cash, Check City, Community Choice Financial, AmeriCash, Cashback Loans, Cash Central, Cash Time, Community Loans. We also filtered for amounts greater than $75 and no more than the state-specific maximum (e.g., $300 in California), where applicable. Fifty-seven EWA users in our sample had payday loan transactions, representing approximately 1% of all EWA users in the sample.

[21] States included: Arkansas, Arizona, California, Colorado, Connecticut, Georgia, Illinois, Massachusetts, Maryland, Michigan, Minnesota, North Carolina, New Jersey, New York, Ohio, Pennsylvania, Virginia, and Washington.



www.responsiblelending.org

**The Center for Responsible Lending (CRL)** is a non-partisan, nonprofit research and policy advocacy organization working to promote financial fairness and economic opportunity for all, end predatory lending, and close the racial wealth gap. CRL's expertise gives it trusted insight to evaluate the impact of financial products and policies on the wealth and economic stability of families of color, rural, women, military, low-wage, low-wealth, and early-career workers and communities. CRL is an affiliate of Self-Help, one of the nation's largest nonprofit community development financial institutions. We work in partnership with national and local consumer, faith, and civil rights organizations.

| **North Carolina** | **California** | **District of Columbia** |
|---|---|---|
| 302 West Main Street<br>Durham, NC 27701 | 1970 Broadway<br>Suite 350<br>Oakland, CA 94612 | 910 17th Street NW<br>Suite 800<br>Washington, DC 20006 |
| Ph (919) 313-8500<br>Fax (919) 313-8595 | Ph (510) 379-5500<br>Fax (510) 893-9300 | Ph (202) 349-1850<br>Fax (202) 289-9009 |

Copyright © 2024 by Center for Responsible Lending